| 2 | 351 |
| 8 | 449 |
| 2 | 351 |
| 13 | 518 |
| 2 | 351 |
| 20 | 165 |

JONES *v.* THE PEOPLE.

DAILEY *v.* SAME.

MILSAP *v.* SAME.

JUROR — *alienage — waiver.* A verdict will not be set aside on account of the alienage of a juror to whom no objection was made at the trial.

*Challenge to the favor.* A pre-existing opinion in the mind of a juror is, under the act of 1872 (9 Sess. 94), a ground of challenge to the favor, and the decision of the district court thereon is final and not subject to review in this court.

CONSTITUTIONAL LAW — *act relating to qualifications of jurors.* The act of 1872 (9 Sess. 94), concerning criminal proceedings, does not conflict with the sixth amendment to the constitution of the United States, which secures to persons charged with crime the right to be tried by an impartial jury.

WITNESS — *when and how far the party calling may discredit him.* The party calling a witness cannot afterward assail his general character for truth or the testimony drawn from the witness by him.

But the rule does not extend to testimony drawn from the same witness by the opposite party, and where the government first called a witness and afterward the same witness was called on another point by the prisoner, the government was permitted to ask whether, in relation to the matters drawn from him by the prisoner, he had not given a different account of the matter at another time and place.

*What will discredit.* The same evidence also had a tendency to prove that the witness was more favorable to the prisoner than to the government, and upon that ground it was properly received for the purpose of discrediting him.

*When he may be discredited.* If a witness has no recollection of a statement imputed to him as having been made out of court concerning the matters in issue upon the trial, the fact that he made such statement may, nevertheless, be proved.

NEW TRIAL — *where the evidence* is conflicting the verdict will not be disturbed.

*Error to District Court, Arapahoe County.*

OBJECTIONS made to jurors are sufficiently stated in the opinion of the court. The indictment was for robbery. The prosecuting witness, James Leverton, testified that he came to Denver in the afternoon of the 30th of January, 1873; that he met upon the street Dailey and Milsap, who, after

some conversation, induced him to go to a house on Blake street, called the Corn Exchange, in search of one Isaac Pease, with whom the witness was acquainted ; that when they had arrived at the place last named, they went into a room and one of the prisoners locked the door ; that the prisoners desired the witness to try his luck in a lottery, which the witness declined to do ; that, after some conversation upon that subject, prisoners threw the witness upon the floor, and, with some violence, took from his person a sum of money and a bank certificate of deposit ; that they afterward compelled him to indorse said certificate ; that two of the defendants, Milsap and Dailey, took the witness out a back way into an alley, and put him into a buggy with covered top and sides, and drove him out to the house of one Eldredge, a distance of ten miles or more from the city. There was evidence to show that the witness gave a different account of the affair at Eldredge's house, and he was also contradicted by one Cochran, who testified that he was present in the room at the time of the alleged robbery, and that the witness lost his money by gaming. A witness was called to prove that the buggy was used as stated by Leverton, and the district attorney called Stephen Eldredge, who testified that Milsap, Dailey and Leverton came to his place at or about the time of the alleged robbery ; that Milsap and Dailey went back to Denver in the buggy, and Leverton went on toward Golden City. This witness was afterward called by the defendant, and testified that Leverton had stated at his house that he lost $780 or $800 in gambling, at the time of the alleged robbery. Upon cross-examination at this time this witness was asked whether he did not have a conversation with George M. Hopkins, at a time and place named, in regard to the case, and whether he did not, upon that occasion, request Hopkins to say nothing as to the advice he (the witness) had given to Leverton.

The questions were somewhat different in each case, and although the witness appeared to admit that he had a conversation with Hopkins, he declared that he did not recollect the statements imputed to him.

In rebuttal, George M. Hopkins was called, who testified substantially as follows : I served a subpœna on Eldredge ; he seemed to hesitate ; didn't seem very willing to appear as a witness, as I said to Eldredge he had not ought to be backward in appearing in this case ; if it was as represented, it was one of the most outrageous robberies ever committed in Denver ; I then went on and related the case to Mr. Eldredge ; he said Leverton had told him all about it, and he said he never felt so sorry for a man in his life ; that he had told him not to go to Central City — to return to Denver and report the case to Cook and Hopkins, and they would recover his money for him ; at the same time he asked me not to say any thing about what he had told me, as to the advice he had given Leverton ; he said he was in and out of town at all hours of the day and night, and if these fellows found out that he had informed in this matter, he says they would murder me.

The jury found the defendants guilty.

Mr. H. R. HUNT, for plaintiffs in error.

Mr. M. A. ROGERS, district attorney, for defendants in error.

HALLETT, C. J. Plaintiff in error was indicted jointly with Wm. Dailey, Geo. Milsap, and Chas. R. Ward, for robbery committed upon James Leverton, and the parties were separately tried, resulting in the conviction of all excepting Ward, who was acquitted. In each case of conviction the record has been removed into this court by writ of error, and as the evidence was substantially the same in all of them, the questions presented will be considered in this opinion. All of these questions arose and were presented in the case of Jones, save one, which arose in the case of Milsap in the following manner.

After the jury was sworn, a member thereof informed the court that he was not a citizen of the United States, and no objection being made, the trial went on. It is well under-

stood that alienage is a good ground of objection to a juror, but, if not taken at the proper time, the objection will be considered as waived. *Turner* v. *Hahn*, 1 Col. 24; *Chase* v. *The People*, 40 Ill. 352. The juror was not examined as to his citizenship, and when he voluntarily notified counsel that he was an alien, no notice was taken of it. The right to object upon that ground having been thus distinctly waived, it cannot be relied upon in this court. It is also urged that jurors called in the other cases had formed disqualifying opinions as to the merits of the case, and that challenges based upon that ground were improperly denied. The examination of the jurors disclosed that they had read in newspapers some account of the alleged robbery, and some of them had heard reports of the matter from witnesses and others. Cromwell, who was called in the Jones case, appears to have entertained a more decided opinion than either of the others. To the question whether he had any prejudice for or against the accused, he answered that he had, and that he did not think that he could give the accused a fair and impartial trial. Upon further examination he declared that he was not acquainted with Jones, and that he had no friendliness or animosity toward him; that he did not remember whether he had ever conversed with any one who had knowledge of the facts, but did not think that he had done so, and that his knowledge of the case was derived principally from newspapers. From some portions of his examination, considered without reference to the remainder, it might be inferred that he was hostile toward the accused, but this inference is repelled by the statement that he did not know the accused, and had no feelings of friendship or animosity toward him. Taking the whole examination together, it appears that he had read newspaper accounts of the affair, upon which he had made up an opinion as to the merits of the case, and that he feared that this opinion would influence him in the trial of the cause. The same may be said of the other jurors challenged by plaintiff in error, and the case is precisely within the provisions of the act of 1872 (9 Sess. 94), which pro-

vides that a pre-existing opinion shall not disqualify a juror if the court shall be satisfied, from his examination or from other evidence, that he will render an impartial verdict in the cause.

In the case of *Solander* v. *The People*, decided at the last term of this court, we had occasion to construe this statute, and we then determined that challenges founded upon a pre-existing opinion in the mind of the juror, were, under the statute, to the favor only, and that a writ of error would not lie to the decision of the court thereon. The conclusions then announced are abundantly supported by authority, and we see no reason to change them. *Sanchez* v. *The People*, 22 N. Y. 150.

The suggestion that the act is in violation of the sixth amendment to the constitution, which secures to persons charged with crime the right to be tried by an impartial jury, is not supported by the language of the act. The court is expressly required to ascertain that jurors will determine the case impartially, and if this is not done, both the constitution and the law are disregarded. We see no reason to question the validity of this law upon constitutional grounds, and there is little room for argument as to the proper construction of it. As was said in *Solander* v. *The People*, any opinion by which the juror may be influenced in the trial of the cause should be regarded as good ground of challenge to the favor, but whether it is so or not, is to be determined by the court of original jurisdiction.

The government called Stephen Eldred to prove that Milsap, Dailey and the prosecuting witness Leverton, came to his house in the evening after the alleged robbery, and the same witness was afterward called by plaintiff in error to prove a conversation with Leverton at that time. After the witness had testified in chief on behalf of plaintiff in error, the district attorney inquired whether, at a time and place named, he had not had a conversation with Geo. M. Hopkins in regard to the interview with Leverton, and whether he had not told Hopkins that he was sorry for

Leverton, and had advised him to go to Denver and report the matter to the officers. The district attorney also asked the witness whether he did not, upon that occasion, request Hopkins to say nothing about what he (the witness) had said as to the advice given to Leverton. Objection was made by counsel for plaintiff in error to these questions, which was overruled and the witness answered in sub-stance, that he did not recollect any such conversation. In rebuttal, the district attorney called Hopkins, who testified to the conversation with Eldred, concerning which the latter had been interrogated, and that Eldred admitted that he knew the facts in the case, and that he had advised Leverton in the interview at Eldred's house to return to Denver and report the case to the officers. Hopkins further declared that Eldred asked him not to say any thing about what he had said as to the advice given to Leverton, for the reason that he feared that the parties implicated would murder him. It is claimed that the government gave credit to Eldred by calling him as a witness, and could not, for that reason, afterward impugn his credi-bility, even in respect to matter called out by plaintiff in error. The question is peculiar, Eldred having been called by both parties and the government having assailed his credibility in respect to the testimony drawn from him by plaintiff in error only. It is plain that the evidence of Hopkins, whether regarded as showing that Eldred was under the control of plaintiff in error and his associ-ates, or that he had given a different account of the interview with Leverton, tended to prove that Eldred was unworthy of belief. Upon the broad ground asserted in some of the reported cases that a party cannot be allowed to discredit a witness called by him in any degree, even when such witness has been called by the opposite party, and the discrediting testimony relates solely to facts drawn out by him, the testimony of Hopkins must have been rejected. *Com.* v. *Hudson*, 11 Gray, 64; *Craig* v. *Grant*, 6 Mich. 447.

The rule which forbids a party to impeach his witness is

said to be founded upon the consideration that he has given credit to the witness by presenting him to the court, and he ought not to have the privilege of accepting the testimony, if it be for him, and rejecting it, if it be against him. 1 Greenl. Ev., § 442.

When applied to testimony called out by the party who seeks to discredit the witness the reason is of great force, but it has little application to testimony drawn from the same witness by the opposite party. By bringing a witness into court the party vouches for his general character for truth and for the truth of his statements in regard to the particular matter of which he inquires. Further than this, neither the reason of the rule nor the policy of the law can be safely extended. Even as to the matter to which the witness is interrogated, if he declares against the party calling him, it is still open to proof by the testimony of other witnesses. 1 Greenl. Ev., § 443.

It is obvious that a party may be willing to accept the testimony of a witness upon one point, while he would be utterly unwilling to accept his testimony upon another point, and it is equally plain that a witness may testify truly as to one fact, and untruly as to another. If by calling a witness to prove a single fact a party shall be held to affirm his truthfulness absolutely and in all things, the rule would appear to be a hard one. It is often necessary for a party to call his adversary, or a witness who is hostile to him and who is a principal witness for his adversary, to prove a single fact; and if in such case the witness is subsequently called by the opposite party, justice requires that the party first calling him should be permitted to show the interest or hostility of the witness, not for the purpose of showing that the latter is unworthy of belief generally, but that he is more favorable to one party than to the other. In our view the rule under consideration precludes a party from attacking the general character of a witness called by him, but does not preclude him from proving statements of the same witness inconsistent with his testi-

mony on the stand, delivered at the instance of the opposite party. *State* v. *Norris*, 1 Heywood; 504.

The evidence of Hopkins tended to prove that Eldred was under the influence of plaintiff in error and his associates and that he was more favorable to them than to the prosecution. That such evidence affects the credit of the witness and is admissible for that purpose is clear upon reason and authority, and we think that it was rightly received upon that ground. *Batdorf* v. *Farmers' Bank*, 61 Penn. St. 179 ; *Swett* v. *Shumway*, 102 Mass. 369 ; *Geary* v. *The People*, 22 Mich. 221.

That the testimony was also admissible for the purpose of contradicting Eldred is equally clear. The latter was called to prove a conversation with Leverton, and if he had given a different account of the same conversation at another time, it was proper to show that fact, to affect his credibility. 1 Greenl. Ev., § 462.

By answering that he had no recollection of the declaration imputed to him, the witness could not defeat the right of the government to prove it, and the objection based upon Eldred's answer cannot be entertained. *Ray* v. *Bell*, 24 Ill. 451 ; *Nute* v. *Nute*, 41 N. H. 60 ; 2 Phillips' Ev. 960. The evidence in the case is conflicting and not entirely free from difficulty. In the first place it is claimed that the prosecuting witness contradicted himself upon the stand, but we are unable to find that he did so in any essential matter. He misnamed the place to which he was taken by Milsap and Dailey after the alleged robbery, but this he subsequently corrected. On cross-examination, he falsely denied that he had made a statement in the direct examination, which is found in the bill of exceptions. An illiterate man, unused to the proceedings of courts, will often fall into such mistakes, and the jury can best determine what weight should be given to them upon the question of credibility. There was testimony tending to prove that the prosecuting witness, in the evening after the alleged robbery at Eldred's house, declared that he had lost his money in gaming, thus contradicting his statement in court, that it

was taken from him forcibly. It will not be contended that the witness was absolutely discredited by this testimony, although the jury were at liberty to give it that effect, if they considered it sufficient to prove the fact. Even when a witness has knowingly testified falsely as to a material fact, it is said that his credibility is to be determined by the jury, who may give to his testimony such weight as they think it entitled to. *Mead* v. *McGraw*, 19 Ohio St. 55. And certainly a statement made out of court, and not under oath, inconsistent with testimony given on the stand, will not discredit the witness unless the jury should give to it that effect. This is according to the familiar rule which requires that all questions relating to the credibility of witnesses and the weight of evidence shall be left to the jury. The testimony of the witness Cochrane presents no other or different question. At all points he was opposed to the prosecuting witness Leverton, and it was the right and duty of the jury to determine in whom the truth of the matter was to be found. The circumstances of the case, as narrated by Leverton, were that the money and checks were violently taken from his person by Jones, Milsap and Dailey, in a room to which he had been invited by the two persons last named. Cochrane deposed that he was present at the interview between the parties, and that they played at a certain game, in which Leverton lost his money. One witness affirmed that plaintiff in error secured the money by the illegal act of gaming, while the other witness declared that it was obtained by the illegal act of robbery. In support of the latter, was the extraordinary fact established by the testimony of all the witnesses, that two of the persons charged, seized the unfortunate victim of the crime and carried him a distance of ten miles from the city.

Three juries, successively impaneled in the court below, have found that the prosecuting witness gave a true account of the matter, and we cannot say that they were wrong. We find no error in these records, and the judgments therein recorded must be

*Affirmed.*