## No. 10,590.

## MCGONIGAL v. THE PEOPLE.

Decided December 3, 1923.

Plaintiff in error was convicted of first degree murder.

## *Affirmed.*

1. JURY—*Opinions.* The fact that a juror entertains an opinion as to the guilt or innocence of a defendant, does not disqualify him, if the court believes that he can and will disregard that opinion and return a verdict based solely upon the evidence.

2.     *Opinions.* A juror who admits an opinion on the merits, does not bind the court by his assertion that he can or cannot disregard it. In such a case the court's ruling on a challenge for cause will not be disturbed, unless prejudice or abuse of discretion appears.

3. EVIDENCE—*Insanity.* Opinions of lay witnesses as to the sanity of a defendant in a criminal case, held properly excluded.

4. CRIMINAL LAW—*Insanity—Evidence.* Insanity of the accused is no defense to a criminal charge unless it be shown to have existed at the time of the commission of the alleged crime. Evidence of prior or subsequent insanity is only admissible to the extent that it justifies a reasonable presumption of its existence at the time in question, and in passing upon the admissibility of such evidence a wide discretion is vested in the trial court.

5.   EVIDENCE—*Insanity.*  Exclusion of offered testimony of lay wit-
     nesses as to the sanity of a defendant in a criminal case, held
     not an abuse of discretion.

6.       *Hypothetical Questions.*  Objections to hypothetical questions
     held rightly sustained, the questions not being properly based
     on facts appearing in evidence.

7.   CRIMINAL LAW—*Exclusion of Evidence.*  There was no error in
     the refusal of the court to permit a physician to answer hypo-
     thetical questions by the defense concerning the sanity of the
     accused, where the witness was subsequently called by the
     people, and without objection testified that he had examined
     the defendant and found no indication of insanity.

8.   APPEAL AND ERROR—*Sufficiency of Evidence.*  Facts in a homicide
     case reviewed and held to justify a verdict of first degree
     murder and death sentence.

*Error to the District Court of Las Animas County, Hon.
A. F. Hollenbeck, Judge.*

Mr. JOHN N. MABRY, for plaintiff in error.

Mr. RUSSELL W. FLEMING, Attorney General, Mr. HAR-
OLD CLARK THOMPSON, Assistant, for the people.

*En banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error, hereinafter referred to as defend-
ant, was tried for the murder of Ella Centers.  The ver-
dict was guilty in the first degree and the penalty therein
fixed was death.  Judgment was entered accordingly, des-
ignating the week of February 18, 1923, for execution.  To
review that judgment this writ is prosecuted.

In this case the proof of the killing by defendant was
overwhelming and undisputed.  The sole defense relied
on was insanity.  The only errors assigned, which deserve
notice, are :   (1) The refusal of the court to sustain chal-
lenges for cause to four jurors; (2) the refusal of the
court to permit five lay witnesses to give their opinions as
to defendant's sanity; (3) the refusal of the court to per-
mit an expert witness to answer certain hypothetical ques-
tions.

1. Each of the four jurors referred to had read or heard of the killing and had formed some opinion of the guilt or innocence of the defendant. Each declared he could and would disregard that opinion and return a verdict based solely on the evidence. If the trial court believed those statements—and its ruling settles that point—the jurors were qualified. C. L. 1921, § 5883.

A juror who admits an opinion on the merits does not bind the court by his assertion that he can or can not disregard it. The trial judge may very properly be convinced that the juror is seeking or avoiding service, or that he magnifies or minimizes his ability, or that his conscience is exceptionally tender or callous. In such a case the court's ruling on a challenge for cause will not be disturbed unless prejudice or abuse of discretion appears. Neither are disclosed by this record. *Solander v. People,* 2 Colo. 48, 58; *Jones v. People,* 2 Colo. 351, 354.

2. Four of defendant's witnesses had been inmates of the county jail with him, but had never seen him until more than three months after the killing. Each had either been convicted of some criminal offense or was being held for trial. Each had at some time during his incarceration been told by defendant that only property owners were allowed in the latter's cell and some of them had heard him make a disturbance in the night and call out to one, "That man isn't dead yet." Upon such facts their opinions that he was insane were offered and excluded.

Another witness, McKissick, was an attorney representing defendant by appointment. When asked to detail professional conferences, an objection was sustained on the ground that these were confidential. The trial judge suggested that this objection might be waived; but neither the defendant nor the witness, nor counsel now representing him here, and who was then interrogating, offered to do so. Thereupon the following occurred: "Q. I will ask you to tell what you observed of Mr. McGonigal and his actions and attitude? Mr. Hawley. (District Attor-

ney)  Same objection.  The Court.  Mr. McKissick, just one question.  You never knew the defendant or anything about him until you were appointed in this case? A. No, sir.  The Court.  I think we will sustain the objection."

There was no evidence indicating insanity either before or at the time of the killing.  Insanity is no defense to a criminal charge unless it be shown to have existed at the time the act complained of was committed.  Evidence of prior or subsequent insanity is only admissible to the extent that it justifies a reasonable presumption of its existence at that time.  Whether it does or does not justify such presumption depends upon the facts of each particular case.  In passing upon these a wide discretion is necessarily vested in the trial court.  The same is true of the facts upon which a lay witness may give his opinion on the question of sanity.  Certainly where, as in the instant case, no evidence is offered tending to disclose mental vagary until over three months after the transaction in question, and that evidence rests upon such few and insignificant facts as those above mentioned, it can not be said that the exclusion of lay opinion was any abuse of discretion.  *Turley v. People,* 73 Colo. 518, 216 Pac. 536.

3.  A physician was called by the defense as an expert and his qualifications admitted.  Certain hypothetical questions were propounded to him.  These were long and involved and need not be here quoted.  Each was open to the objection that it either included facts as to which there was no evidence, or omitted material facts whose existence was undisputed, and such objections thereto were sustained.  There was no error in those rulings.  Moreover this same witness was called by the people on rebuttal and testified without objection that he had examined defendant and found "absolutely nothing" to indicate that he was insane.  The only other evidence on this subject was that of the people's witness, Beshoar a physician whose qualifications were admitted, who testified that he also had examined defendant and found him sane.

In view of the gravity of this offense and the extremity of the penalty we have examined with care the entire record and considered every alleged error worthy of notice, notwithstanding the fact that of the thirteen assignments four are not referred to in the motion for a new trial and none of the others specifically pointed out therein.

This murder was particularly atrocious. Ellen Centers, mother of the deceased, had recently opened a boarding and rooming house at the Royal mine in Las Animas county and the daughter Ella had temporarily abandoned employment at Trinidad, the county seat, and her stenographic studies, to assist in that enterprise. For several years theretofore the mother had been engaged in the same business at different places and defendant had been one of her intermittent boarders. Until just preceding the commission of this crime he had been friendly with Mrs. Centers and was interested in her venture to the extent of having loaned her money. He was now about forty-two years of age and was employed as a mine guard. Wilbur Ferguson, a student at the School of Mines at Golden, Colorado, seeking work during his vacation, had obtained employment as a watchman at the Royal mine and board and room at the Centers home. He had been there about two weeks at the time of the tragedy. Defendant seems to have taken a dislike to him and resented his presence. On the evening of May 31, 1922, defendant quarreled with Ferguson at the boarding house and drew a gun on him and Mrs. Centers, and her daughter interfered. Defendant seems to have evinced a disposition to dictate to the elder woman concerning her affairs and to exercise some control over the younger. He particularly resented young Ferguson's visiting with Ella and began to accuse the women of running a disorderly house. On the morning of June 1, he quarreled with Mrs. Centers and became particularly abusive. About noon he renewed his outburst and shortly after the mid-day meal Mrs. Centers started to the town of Aguilar to complain

to the authorities. He followed her part of the way with threats and curses and then returned to the mine. Going into the boarding house he evidently found Ferguson there writing a letter and killed him, as Ferguson was found on the floor near the dining room table, on which was an unfinished letter, and the dead man's fountain pen was clutched in his right hand. In the open left lay a revolver, evidently placed there later by defendant. Ella ran from the house toward a railway bridge in course of construction where a gang of men were at work, followed by defendant with a shotgun. As the girl neared the bridge defendant fired and apparently inflicted upon her a slight injury. She continued her flight, however, and succeeded in reaching the opposite bank. Defendant, standing on the bridge with the girl before him begging for her life, fired again and killed her. Ignoring the presence of the bridge gang he then calmly returned to the boarding house. After he entered it the railroad men heard five revolver shots and one shotgun shot. When found defendant was lying on the floor of the boarding house with a wounded foot, and, as one of the rangers testified, "trying to appear as if he was dead." The several witnesses then present agree, however, that he was perfectly rational. Upon being searched and turned over he began to talk. Among other things he said, "I had to do this." "I was defending my life." "I was fighting for my life." To the corporal's statement, "You wasn't fighting for your life when you shot the girl," defendant replied, 'Well, dead men tell no tales." The evidence clearly indicates that upon his return to the house he had fired the revolver shots to simulate an affray, laid the revolver in Ferguson's open left hand, and shot himself in the foot with the shotgun, inflicting a more serious injury than he had intended. Defendant himself took the stand and his story, gathered from the record, seems perfectly clear as far as he goes. He says that upon his return to the boarding house he ordered Ferguson out, then got the gun and started over to where he was; that Ella ran up be-

hind him and caught the gun and it seemed to him like he heard one shot. Thereupon his memory failed him. He protests that he heard nothing more and knew nothing more until he waked up in a hospital; that he did not know he had killed Ferguson or the girl, and did not know they were dead until he was told of it.

Such in brief, is the story of this hideous and wholly inexcusable crime, in defense of which the sole plea offered is that mythical insanity supported by those few shreds of evidence we have hereinbefore set out. From a further examination of this record, it seems reasonable to conclude that McGonigal first intended to plead self-defense and immediately following the shooting of the girl made such hasty pretenses thereof as the speedy arrival of railroad men and rangers would permit; that he later realized the incongruity of the plan and his defense of insanity was concocted while confined in the county jail and inspired by his perusal of newspaper accounts of the defense in *Turley v. People, supra.* Evidence was offered that defendant, some ten years preceding the commission of this murder, had been afflicted with syphilis, although the most careful medical examination disclosed no trace thereof. It will be noted that insanity was the defense in the Turley case and that it was there ascribed to the ravages of syphilis. The Turley murder was committed ten days after this. On June 21, a commission found Turley insane, and July 18, following, a jury returned him sane. This defendant was arraigned September 11. The verdict of guilty was returned against Turley September 25, and his motion for new trial was filed October 11, the date on which the trial in the instant case began.

With the foregoing facts before it, it is not surprising that this jury found defendant guilty of murder in the first degree and fixed the punishment at death. In view of this record we are unable to see how any other conclusion could be reached, nor is it easy to conceive a murder committed under circumstances which would warrant the death penalty if those here disclosed do not justify it.

The judgment is accordingly affirmed, and it is further ordered that it be executed during the week commencing March 10, 1924.

MR. JUSTICE CAMPBELL not participating.