No. 14,205.

JOHNS ET AL. *v.* SHINALL.
(86 P. [2d] 605)

Decided January 9, 1939.

381

382

Mr. W. A. ALEXANDER, Mr. CECIL M. DRAPER, for plaintiffs in error.

Mr. H. BERMAN, Mr. FRED N. HOLLAND, Mr. JOSEPH N. LILLY, for defendant in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

DEFENDANT in error brought an action in the district court to recover damages for personal injuries alleged to have been sustained by him in a collision between the car in which he was a passenger and a truck, caused as he claimed, by the negligence of the driver of the truck which belonged to and was being operated by the servant and employee of plaintiffs in error. The parties will be designated as they appeared in the trial court. The verdict of the jury was for plaintiff. Judgment was entered on the verdict, to reverse which defendants prosecute a writ of error.

The complaint was in the usual form. The defendants denied negligence. For affirmative defenses they set up contributory negligence on the part of plaintiff and that

plaintiff's injuries were caused proximately and solely by the negligence of the driver of the car in which plaintiff was a passenger.

The collision occurred at the intersection of Washington street and 66th Avenue which is outside of the city limits of Denver. Washington street extends northerly and southerly. At the time of the accident the traveled portion was 33 feet in width with about ten or twelve feet of roadway extending to a fence on either side. Sixty-sixth avenue intersects Washington and runs in an easterly and westerly direction. The traveled portion at the time of the accident was 21 feet wide with an additional space of ten or twelve feet also extending to fences at the side. Washington street was gravelled and was about three feet higher than 66th avenue which was an ordinary dirt road. At the time of the collision the truck was proceeding westerly on the northerly side of the traveled portion of 66th avenue at a speed variously estimated at from ten to twenty miles per hour, plaintiff's witnesses placing it at twenty, and defendants' at ten miles. The passenger car was proceeding northerly along the easterly side of the traveled portion of Washington street at a speed estimated variously from thirty to forty miles per hour. The driver of this car, a garage man, said he was proceeding at a speed of about thirty-five miles per hour, possibly a mile or two more or less. The right front bumper of defendants' truck struck the right rear wheel of the car in which plaintiff was riding. The point of impact, according to the testimony of defendants' witness Walters, was practically in the center of the traveled portion of Washington street and near the northerly line of the traveled portion of 66th avenue, and as to this point there is no substantial conflict in the testimony. This locates the point with respect to the truck approximately sixteen and one-half feet from where the front end of the truck entered the intersection of the traveled portion of the road and approximately twenty-six feet from

where it would enter the intersection of the two roads considering it as bounded by prolongations of the fence lines. With respect to the Ford tudor sedan in which plaintiff was riding it locates the point of impact a little less than twenty-one feet from where the front end of the car would enter the intersection of the traveled portion of the roads and approximately thirty-one feet from where it would enter the intersection of the roads considering it to be bounded by prolongations of the fence lines. The growth of trees inside the fences was rather heavy and extended to the southeasterly fence corner of the intersection, placing the heavy growth on plaintiff's right as the car in which he was riding approached it and on defendants' driver's left. The testimony of defendants' employee Walters, who was on the truck with the driver, as abstracted, is in part as follows:

"I was in charge of the truck involved in the accident. Mr. Cox was driving and I was riding with him at the time. We were going west on 66th and we slowed down, changed gears, before we pulled into the intersection. I did not see any other car. I looked just before we pulled into the intersection and if you look right good to the south I would say that you could see for 50 feet. I looked right good but did not see anything. We pulled into the intersection and then their car struck the bumper on the truck. I would say we were traveling 10 miles an hour. When I saw the other car just a minute before he hit, I judge he was going over 40 miles an hour. The collision occurred practically in the center of the intersection, east and west. We were on our right side of the road, that is, on the north side of 66th. The collision did not move the truck more than 6 or 8 inches. It rolled about 8 or 10 feet after the accident. * * * I would say the truck entered the intersection first."

The testimony of Couchman, the driver of the car, as abstracted, is in part as follows:

"Q. There are not trees or shrubs outside of the fence line on either 66th avenue or Washington,—isn't that cor-

rect? A. Yes. Q. So, as you approach this intersection, you don't have to actually go into the intersection before you can see some distance out 66th avenue. A. Sure. Q. That is true of any intersection? A. Yes. Q. When you speak of intersection what do you mean, do you mean the intersection of the traveled portions of the roadways? A. I would say it would be the road. Q. Or do you mean the intersection of the fenced portion of the roadways, which one? A. The road. Q. The traveled portion? A. Yes. Q. When you say you were one-third of the way into the intersection, you mean you had gone two or two and a half of these seven steps you say 66th avenue was wide, is that correct? A. Yes. Q. How much of a glimpse of the truck did you get? A. I just seen the truck. Q. Where was your automobile when you first saw it? A. I had already started in the intersection. Q. How far in were you? A. About a third of the way. Q. Where was the truck? A. The truck—I just seen it on my right, I would say about two cars away, or three. Q. Had it entered the intersection? A. He was about ready to start. Those trees are inside the fence and they hung over. The truck was two or three car lengths away when I was a third of the way into the intersection. By car lengths I mean the length of my car. I would say the truck was traveling around 20. Q. Did you watch him while he proceeded from that point two or three car lengths away until he struck you? A. No; I tried to get out of his way. Q. You looked at him just once? A. Looked at him long enough to see he wasn't going to stop. Q. How long did you look at him? A. I just looked at him. Q. When he was two or three car lengths away? A. Yes. Then I swerved to the left to get out of the way.''

It will be observed that Couchman says when he was a third of the way, or seven feet, into the traveled part of the intersection that he saw defendants' truck two or three of his car lengths away, about ready to enter the inter-

section. Plaintiff Shinall testified the car entered the intersection first and Walters testified that the truck entered it first.

It is pertinent to observe that the state statute governing this situation is as follows: "(a) The driver of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection from a different highway.

"(b) When two vehicles enter an intersection from different highways at the same time the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right." '35 C. S. A., c. 16, §208.

■ We think under the testimony which we have just set forth that clearly there was an issue of fact presented as to which of the two vehicles involved took the right-of-way from the other. If the car in which plaintiff was riding was first in the intersection it was the duty of the truck to yield the right-of-way and a violation of that duty would be negligence. There being competent evidence from which the jury might find defendants' driver negligent it was not error to submit the cause to the jury.

A large part of plaintiffs in error's brief is devoted to the alleged error of the court in refusing to sustain defendants' motion to declare a mistrial. Counsel for defendants handed to one of plaintiff's witnesses what purported to be a written statement signed by the witness and said: "Mr. Couchman, I will hand you defendants' exhibit No. 8, ask you to examine that and tell me if you can what it is." One of plaintiff's counsel evidently seeking to prevent anything improper being made a part of the record then said: "Let him answer the question yes or no." Counsel for defendants responded: "I asked him to tell me what it is." The question was then read, and the witness began his answer saying, "There was an insurance agent came out next day—" At this point counsel for defendants interrupted. The witness did not proceed with his answer and counsel for defendants im-

mediately made a motion "for a mistrial," which, after argument, the court denied.

It is permissible to interrogate prospective jurors, some of whom may be selected to serve in the case, as to their connection with or interest in insurance companies, and we have held that questions touching this matter may be asked of every prospective juror. *Potts v. Bird,* 93 Colo. 547, 27 P. (2d) 745. In the case of *Rains v. Rains,* 97 Colo. 19, 46 P. (2d) 740, a suit by a wife against her husband for damages resulting from an automobile accident allegedly occasioned by the latter's negligence, the prospective jurors were interrogated in such a manner that it was contended that they were advised that the husband carried automobile accident insurance and that his loss by virtue of any judgment against him would not fall on him but on the insuring company. No man of ordinary intelligence, examined as those jurors were, could escape the conclusion that the defendant, the husband of plaintiff, was insured against such loss. Reversal was sought on this ground. After setting forth the necessity of permitting a wide latitude in examination of jurors as to their personal and business connections and citing instances in point we said: "But when a personal injury case comes on for trial the trial court is asked to conceal behind an impenetrable veil of secrecy the indemnity company's interest in the outcome of the litigation, which is more direct than is the interest of a cattle dealer's association in the outcome of a criminal prosecution for cattle theft. It is not always easy to do that. In these days of automobiles, indemnity insurance has assumed vast proportions. By extensive advertising and personal solicitation, indemnity companies have scattered broadcast the nature of their business and have made it a matter of common knowledge. Few, if any, jury panels do not include owners of automobiles, and it is folly to attempt to blind ourselves to the fact that most, if not all, jurors know of the existence of indemnity insurance companies

and their frequent connection with automobile accident cases. In such circumstances, it is difficult for the courts to strike a balance between the rights of the plaintiff on the one hand, and those of the defendant and his indemnitor on the other, and fully protect the rights of all. A question put to a prospective juror as to whether he has any interest in or connection with a certain indemnity company would convey to the mind of every intelligent juror the knowledge that an indemnity company was interested financially in the outcome of the litigation; and yet no one could successfully challenge counsel's right to ask that question. *Vindicator Con. G. M. Co. v. Firstbrook*, 36 Colo. 498, 86 Pac. 313; *Cripple Creek Mining Co. v. Brabant*, 37 Colo. 423, 87 Pac. 794; *Independence Coffee & Spice Co. v. Kalkman*, 61 Colo. 98, 156 Pac. 135; *Tatarsky v. Smith*, 78 Colo. 491, 242 Pac. 971; *Bolles v. Kinton*, 83 Colo. 147, 263 Pac. 26.''

We think the foregoing is applicable to the situation presented by the instant case. The inadmissible statement was not brought into the case by plaintiff, but by a witness in response to a question by defendants' counsel that might well draw out from a layman an answer such as the witness commenced to make. Under our methods of trial procedure we cannot hope to eliminate entirely questions by counsel so general that they elicit answers by witnesses containing immaterial matter. That inadmissible testimony and improper suggestions will be placed before the jury, sometimes unintentionally and perhaps in rare instances intentionally by an overzealous counsel are matters which cannot be wholly avoided. We are not unmindful of our holding in *Phelps v. Loustalet,* 91 Colo. 350, 14 P. (2d) 1011, that it is immaterial whether the jurors be advised ''fortuitously or designedly'' that the defendant carried liability insurance, the fact of their being so advised works incurable prejudice. The effect of such a rule is to hold any juror with knowledge that a defendant, in a case of this character, is protected by in-

surance, so lost to considerations of honor and justice as to be either unwilling or incapable of returning a verdict on the evidence and the law as given him by the court. We now think that the rule there announced is too broad and that it should be modified. Any juror whose character is such that he will be affected in the rendition of his verdict by definite information that defendant carries liability insurance, would be equally so affected by the implied suggestion that a defendant carries such insurance conveyed to him by questions as to his relationship to insurance companies, clearly proper on a voir dire examination. It is permissible, and rightly so, that each of twelve prospective jurors in a case be asked on voir dire examination whether he is a stockholder, agent or employee of an insurance company. We have heretofore held that if, during the trial, the same twelve men are advised by inadmissible testimony, whether introduced unintentionally or designedly, that defendant is insured they become ipso facto and instantly as a matter of law too prejudiced to render a fair verdict. If incurable prejudice results in the one case, logically it obtains in the other. If it is not incurable as a matter of fact in the one instance it is not incurable as a matter of law in the other. To attempt a distinction between the two is equivalent to giving weight to the mental processes of an ostrich that puts its head in the sand and assumes the nonexistence of a danger that thereby it is unable to see. To be consistent, if we hold there is incurable vice in a suggestion of such fact during trial, we should also declare that a suggestion of it before trial is an equally incurable vice, and this we are not willing to do. We are of the opinion that testimony or statements that defendant is insured in an indemnity company—clearly inadmissible in the ordinary action for damages—which for one reason or another comes before the jury, is to be treated as in the case of any other admitted inadmissible testimony. There is, or should be, no magic in the mere mention of the name

of an insurance company to work mistrials. Even in a criminal case, a juror who has formed or expressed an opinion as to the defendant's guilt, if he says he can and will set that opinion aside and render a verdict based solely upon the evidence and the law as given him in the instructions of the court, is not disqualified to sit and determine issues involving a defendant's life or liberty. Section 54, chapter 95, '35 C. S. A., is as follows: "No person summoned as a juror in a criminal case shall be disqualified to serve as such by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused; provided, the court shall be satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict, according to the law and the evidence submitted to the jury in the trial of such cause." See, also, *Jones v. People,* 2 Colo. 351; *Solander v. People,* 2 Colo. 48; *Jones v. People,* 6 Colo. 452; *Babcock v. People,* 13 Colo. 515, 22 Pac. 817; *McGonigal v. People,* 74 Colo. 270, 220 Pac. 1003.

We are of the opinion that information that a defendant, in a case of this nature, carries liability insurance which is conveyed to the jury either intentionally or inadvertently should be dealt with by the trial court in the same manner as is any other inadmissible testimony. On motion it should be stricken and the jury instructed to disregard it. If requested, we think that a formal instruction as to its immateriality and the duty of the jury to disregard it in determining liability and damages might be given with propriety. In the instant case defendant was entitled to nothing more. Not having requested any of these things he now has no ground for complaint that he did not receive them.

In laying down the foregoing rule as applicable to the instant case we are not to be understood as sanctioning the practice of introducing improper testimony for the purpose of influencing a jury. Any attorney who presents inadmissible testimony with such a purpose in view, or

who in any manner advises a jury sworn in a case, of facts clearly inadmissible in evidence deserves the censure of the trial court, and if the court is convinced that such purpose is being designedly carried out and has reason to believe it will have a prejudicial effect, he of course should not protect the offender from his own wrongdoing and should exercise his power to declare a mistrial. Nor are we to be understood as saying that under no circumstances would it be proper to declare a mistrial if such facts were improperly, though unintentionally, brought to the attention of the jury. Such matters are to be left to the sound discretion of the trial judge and unless he has clearly abused it there should be no interference with his decision regarding them. Even under the rule as announced in *Phelps v. Loustalet, supra,* the trial court apparently did not think that prejudice would result in this case. It does not appear, other than by inference, that the insurance man mentioned by the witness represented the indemnity company in which defendants were insured, even if it is a fact that they carried liability insurance. Technically there may have been no violation even of the strict rule, but assuming that there was such a violation, we believe the rule herein announced is more consonant with reason; that it is more in harmony with the underlying principles that govern jury trials than that laid down by our former decision; and that it provides an adequate safeguard for the defendants' rights against prejudice by jurors discovering as a fact in the particular case that which in view of the extensive purchase of liability insurance, by car owners, they know by virtue of the knowledge they possess in common with the generality of mankind, is true in a large percentage of such cases.

It is urged that photographs of the car taken after the wheel damaged by the collision had been replaced by another, were erroneously excluded. Admittedly they do not show the condition of the car as it existed after the accident, but no question as to damage to the car is here

involved; plaintiff is suing for damages for personal injuries. There is no showing or contention that his injuries did not result from the collision. There is no question but what the right rear wheel and fender of the car in which he was riding were struck by the right end of the truck front bumper. The variation in appearance of the car as photographed from what it was before the wheel was changed being explained, we think, in line with authorities cited by the defendant, that the exhibits might have been properly admitted, but we fail to perceive, as doubtless did the trial court, its relevancy to any material issue. We think the exclusion of these exhibits does not require a reversal of the judgment.

■  Defendants assign error to the sustaining of objections to certain hypothetical questions propounded to Dr. Edward F. Dean, a witness for defendants, predicated solely upon testimony given by Dr. Casper Markel. It appears that although Dr. Dean had examined plaintiff that notwithstanding such fact there was no attempt by defendants' counsel to elicit from him the results of his examination. On the contrary counsel attempted to establish the probable extent and duration of disability without regard to facts concerning plaintiff's physical condition as ascertained by the witness from his personal examination. We think the record discloses that the hypothesis based on a purported statement of the physical condition as disclosed by testimony of Dr. Markel—which was not disputed—was vulnerable to the objection that it did not state all the facts which one testifying solely as an expert should assume. This is not a case in which the evidence as to plaintiff's physical condition is conflicting. We find no error in the rulings of the court sustaining the plaintiff's objections.

The instructions given fairly covered the law as to the issues involved. We are not impressed by the errors assigned either to the instructions given or to those tendered by defendant and refused.

The judgment is affirmed.

Mr. Justice Holland not participating.