[No. 5942.]

THE GREELEY IRRIGATION COMPANY ET AL. v.
VON TROTHA.

1. **Limitations—When Action Accrues**—In 1870 the defendants had constructed in a stream which traversed plaintiffs' lands a dam, to turn water into an irrigating ditch. This dam, being temporary in character, was on several occasions swept away, and afterwards reconstructed. This condition continued until the year 1903. In that year a permanent dam was constructed. In 1905, owing to the negligence of defendant in the management of the dam, a sandbar was formed above it, by which, a freshet occurring, the waters of the stream were cast upon plaintiffs' lands, destroying their crops. Held, that plaintiffs' cause of action accrued when the water invaded their premises and the damages were occasioned.—(17, 18)

2. **Easement—By Prescription—Extent**—Under secs. 2339, 2340, Rev. Stats. U. S., one who has, in order to fill an irrigating ditch, constructed and maintained a dam in a stream, is entitled, as against one who subsequently enters public land upon the stream and obtains a patent with the reservations and conditions set down in the statute, to maintain the dam at the same height as previous to, and at the time of, the entry of such lands; but he has no right to erect or maintain a new dam so as to impose a greater servitude or burden upon such lands than that imposed by the previous structure.—(18)

If the dam was originally so constructed as to go out during flood times, or with flash-boards removable in time of high water,

no easement was thereby acquired to erect and maintain a solid and immovable dam.—(18-20)

3. **Canals and Ditches — Liability of Owner —** The owner of an irrigating ditch who constructs a dam to turn water thereto, is liable for injuries thereby occasioned to adjoining lands of another, only when the flood is such that by the exercise of reasonable foresight it could have been anticipated and guarded against.—(21, 22)

4. **Instructions—Misleading —** Plaintiffs suing for an injury occasioned to their lands by the obstruction of the stream by a sand-bar therein, which was formed by reason of defendant's negligence in the operation of its dam, gave evidence to sustain this allegation. An instruction that the defendant must be acquitted if the overflow was caused by "islands and sandbars above or below said dam and the bushes, trees and drift, collected therein," was properly refused.—(22)

5. **Appeals—Harmless Error—**The refusal of a particular instruction prayed is harmless, where those given are as favorable to the party as the facts justify.—(23)

6. **Trials — View By the Jury —** Whether the jury shall be sent to view the place where the injury occurred or the structure to which it is attributed, is entirely in the discretion of the trial court.—(23)

7. **New Trial—Misconduct of Jury—**That the verdict was a chance verdict may be shown by affidavits of jurors.—(24)

8. **Quotient Verdict,** shown to have been afterwards voted upon and accepted by the jury as a legitimate result of which little proof is required, will be permitted to stand.—(23, 25)

9. **Bill of Exceptions—Where Necessary—**The motion for a new trial and the affidavits in support of it must be brought into the record by bill of exceptions, if error is to be assigned thereon.—(24)

*Appeal from Weld District Court*—Hon. JAMES E. GARRIGUES, Judge.

Mr. C. D. TODD, for appellant.

Mr. ELBERT C. SMITH, for appellee.

Mr. JUSTICE WHITE delivered the opinion of the court:

Appellees, as plaintiffs, brought this suit against appellants to recover damages to their crops, caused

by the overflow of the Cache la Poudre river upon their lands. The appellants owned and operated, jointly, a certain line of ditch commonly known as "Canal No. 3," which has its headgate on the south bank of, and takes its supply of water from, the Cache la Poudre river, at a point upon plaintiffs' land.

The complaint, in substance, alleges: that defendants in November, 1903, constructed a wooden dam or check in, and across, said river, at a point about sixty feet below the headgate of Canal No. 3; that during the spring of 1905 defendants negligently allowed sand, silt and the debris from the river to accumulate in said canal and headgate thereof; that about the 5th day of June, 1905, the defendants negligently allowed said dam or check to remain in the river during a rise of the water, neither raising nor lowering it; that on account of said accumulation of sand and debris, and on account of not properly handling or regulating said check or dam, the defendants caused the water in the river to back up and overflow its banks in and upon plaintiffs' property to their damage; that said water would not have escaped its river banks, but would have remained therein, without harm to the plaintiffs, if said sand, silt and debris had been properly removed, or said check or dam raised or lowered in the river.

The answer, after admitting certain allegations of the complaint, alleges, in substance: that in 1870, while the land owned by plaintiffs was a part of the public domain, the assignors of defendants constructed a dam across the river at substantially the same point, and of the same height, and for the same purpose as the dam or check of which complaint is made; that from time to time said dam was repaired and reconstructed, and such was the work done thereon in November, 1903; that the dam as repaired and reconstructed, with flash-boards thereon, was no

higher, and no greater obstruction in the river than the dams previously maintained at said point; that said dam was necessary for the operation of said canal, and was constructed according to the customs and laws relative to the construction of dams and canals for the appropriation of water; that the patents for the land, owned by plaintiffs, conveyed the same subject to the rights of defendants to maintain said dam as theretofore maintained, and that ever since, said dam has been maintained, used and enjoyed, with the knowledge and consent of all owners of said land, including plaintiffs; that by reason of the premises the appellants obtained, and had a vested right and easement in and upon said land and stream, to keep and maintain said canal, headgate and dam, with the right to check back the waters in the stream and upon appellees' land; that the injury complained of was caused by an extraordinary flood; that plaintiffs had allowed the river channel to become narrowed by the undergrowth and the accumulation of debris in the channel upon their own land, and thereby caused the overflow and consequent injury; that plaintiffs' cause of action accrued more than six years, and more than twenty years before the commencement of this suit. The answer then denies all other allegations of the complaint. A replication was filed and the cause subsequently tried. The defendants requested, at the close of the evidence, that the jury view the premises, which was denied. A verdict was returned, and judgment entered, for plaintiffs, from which defendants prosecute this appeal.

In 1870 the defendants, or their predecessors in interest, built a dam of dirt, gravel and brush, commonly known as a "brush dam," across the river at a point about sixty feet below the headgate of Canal No. 3, for the purpose of diverting therein the water

from the river.  The dam would at times wash out, and was rebuilt practically in the same manner from time to time until 1883.  In the fall of that year the brush dam was replaced by one made of piles and plank, with flash-boards, which were taken out or off during periods of high water.  This dam with the flash-boards was practically of the same height as the original dam.

In November, 1903, the piles forming the basis of the dam constructed in 1883, were sawed off, and an apron or floor was constructed thereon, which consists of plank three inches thick and twelve feet long; above the apron is a structure made of 8″x 8″ timbers about twelve feet in length, set five or six feet apart, at an angle of about 45° down stream; on each timber in the center is a 2″x 2″ board, and on that a 2″x 8″ cleat, forming a slot or groove, into which boards, so made as to slide up or down, are placed, forming the face of the dam.  These sliding boards are commonly known as "flash-boards" and in operating this dam, as well as the one built in 1883, it was the intention and custom to take out, remove, lower or raise these flash-boards during flood times, in order to allow a freer passage of the water in the river.  The dam is supplied with a sand chute about fifteen feet in width, operated for the purpose of keeping the headgate and ditch from choking up with sand.  The sand chute was not operated in 1904, and a sandbar filled in above the dam in the ditch, and in front of the headgate.  It was about 130 feet long, 30 to 40 feet wide, 1½ feet in depth, and extended about 40 feet past the headgate.  It was two-thirds larger than any sandbar previously there.  It so remained in 1905, at the time plaintiffs' crops were destroyed, extending into the ditch, between the headgate and the weir.  When the high water that damaged plaintiffs came, the flash-boards

tightened and could not be removed, lowered or raised.  At the time of the construction of the brush dam the lands of plaintiffs belonged to the United States, and so continued, as to one portion thereof, until 1874, and as to the other, until 1895, when patents issued to the then purchasers, who thereafter conveyed the same to plaintiffs.  The patents to plaintiffs' land conveyed the same "subject to any vested and accrued water rights  *  *  *  and rights to ditches and reservoirs used in connection with such water rights as may be recognized by the customs, laws and decisions of courts  *  *  *  as by law provided."

At the close of the evidence, the court took from the consideration of the jury the third alleged defense, and instructed them, in effect, that if plaintiffs were injured as alleged in the complaint, their cause of action accrued at the time the damages were sustained, to wit: in June, 1905, and was not barred by the statute of limitations.  The action of the court in this respect is urged as constituting reversible error. It is contended, that this defense involved two propositions; first, "that the plaintiffs purchased their lands with full knowledge of the rights of defendants in and to said dam and ditch, and the nature and extent of said appliances as existing structures, and the effect of the use and operation thereof upon said lands"; and, second, "the defense of the statute of limitations."  All the matters contained in the third alleged defense, except solely the statute of limitations, were covered and plead in each of the two preceding defenses, and were therein fully submitted to the jury.  Moreover, it is quite evident the pleader never intended to present, by the third defense, nor did the court, or jury, understand, that thereby there was presented any defense other than the statute of limitations.  Plaintiffs' cause of action accrued when

(2)

the water invaded their premises and the damages occurred, and not before. The court, therefore, properly told the jury that plaintiffs' cause of action, if proven, was not barred by the statute of limitations.

Defendants contend, that under the facts of the case, and by virtue of §§ 2339 and 2340, Rev. Stats. of the United States, and by the reservations in the patents to the land of plaintiffs, the former acquired, and still have, the right to maintain a permanent dam of the elevation originally constructed, and that the court ignored such right by refusal to give instruction No. 6 requested by them. We think that the instruction requested was fully covered by other instructions given, and the matters of defense plead, were fairly submitted to the jury.

It is, perhaps, true that defendants had a right to maintain a dam across the river at substantially the same place and of the same height, and which set back the water in the river to the same extent as the dam originally constructed and maintained, and plaintiffs acquired their land subject to such right, and could not recover for an injury sustained by them by reason of the fact of such dam. To this effect the court instructed the jury. The defendants, however, had no right to rebuild, and maintain a new dam in such a way as to place a greater servitude or burden upon the property of plaintiffs than had been put upon it by the construction and maintenance of the previous dams, and the jury were so advised.

They were, in effect, told, that defendants had a right to maintain a dam across the river for the purpose of diverting water into their ditch, and that plaintiffs acquired their lands subject to the defendants' right to have the dam maintained at its original height, and, if the dam "had since been always maintained at said height," plaintiffs could not recover

for any injury resulting therefrom. They were further told, that if they believed "from the evidence that for a period of twenty years or more before the injury complained of, the dam was constructed, kept and maintained at substantially the same place, and at all times of the same height so that it would at all times set back the waters of the river to the same extent" as the one complained of, "and that said dam was at all times so maintained and set back the river water," the defendants had thereby acquired an easement in the land of plaintiffs to check up and set back the said river to the extent which they believed from the evidence had been done, if any, during the period of twenty years prior to the alleged injury, "and if you believe from the evidence that said dam at all times checked up and set back the waters of said river to the same extent as it now does, then plaintiffs cannot recover." The jury were then told that if they found from the evidence that the dam originally built was of dirt, brush and like material, and that the same washed out, during flood times, and allowed a freer flow of water in the river, and that about 1883 a permanent dam, with flash-boards and of the same height, instead of the other, was placed in the river, and that said flash-boards could be taken out or removed, and it was the custom to take them out or remove them during the flood times in order to allow a freer passage of the water in said stream, and that said permanent dam was so operated substantially until 1903, then defendants had acquired no easement in said river or against said lands of plaintiffs to maintain a solid, immovable dam of the same height of the prior ones.

It is argued that these instructions are erroneous in that they require, in order to invest defendants with an easement in plaintiffs' lands that would relieve the former from damages to the latter, that the

dam be maintained as it was originally built, and that it set back or check the water "at all times" to the same extent; that thereby the jury were, in effect, told that a temporary break in the dam destroyed the easement, "or that if by reason of low water at some time, the dam did not check or back up the water so high as at some other time, therefore the easement was lost." In our opinion the words used do not warrant the conclusions reached by defendants. Ample evidence established the fact that the original dam was of brush, dirt, and like material; that it washed out during flood times and allowed a freer flow of water in the river; that in 1883 a more permanent dam was built in its stead; that this dam was supplied with flash-boards which could be, and which it was the custom to take out during flood times in order to allow a freer passage of the water in said stream; that said dam was operated substantially in that manner until 1903. The evidence warrants the conclusion that the dams constructed, maintained and operated by the defendants, and their predecessors in interest, were adjustable, regulated dams, permanent in the sense of vesting in defendants a right or easement for the diversion into their canal of their appropriation of water from the river, but permanent for no other purpose. The instructions, while recognizing defendants' easement to maintain a dam in the river for diverting purposes, limited such right or easement to the manner and extent it had been maintained prior to, and at, the time plaintiffs acquired their interest in the premises.

The jury were not told, as defendants contend, that, "if the brush dam washed out during flood times, no easement could be established." On the contrary, it was left to the jury to determine whether the dam was originally built of dirt, brush and like material, and whether it washed out during flood

times, and allowed a freer flow of water in the river, and whether in 1883, in its stead, a dam was built with flash-boards upon it, which could be, and which it was the custom to take out or remove during the flood times, in order to allow a freer passage of the water in the stream, and whether the dam was operated substantially in that manner until 1903. If the jury found in the affirmative on these questions, they were told that it necessarily followed that defendants "would have acquired no easement in said river or against said lands to maintain a solid, immovable dam" of the same height of the original dams. They were in no wise instructed that a temporary break in the dam, or a reconstruction of the dam of different material, affected the original easement acquired by its construction. On the contrary, the instructions expressly recognized the easement acquired, and limited defendants' rights accordingly.

The court in defining "an extraordinary flood" told the jury that it "means one of the heaviest that ever occurred in the locality," and it is claimed that this was erroneous. Certainly an "extraordinary flood" is one of the heaviest that ever occurred in the locality. If there were many such, they would cease to be extraordinary, and become only ordinary. But should we assume that the particular words are improperly used as applied, yet it is clearly evident from the entire instructions, that the jury were not misled thereby. In the preceding instruction they were told that if they believed from the evidence that the river overflowed its banks by reason of an extraordinary flood of water or freshet coming down the river, and which it was not capable of carrying within its banks, and was not occasioned by the dam of defendants, plaintiffs could not recover. And in the instruction in which the alleged objectionable words were used, the jury were told that "defendants

would be excused from liability on account of (an extraordinary) flood, provided that it was such that by the exercise of reasonable foresight and prudence the natural consequences of such a flood could not be foreseen and guarded against." We think the instructions upon this question fairly submitted the matter to the consideration of the jury.

Defendants requested, and the court refused, an instruction to the effect that, if the overflow of the river, which resulted in the damage to plaintiffs, was caused "by reason of certain islands and sandbars in the river above or below said dam, and the bushes, trees, driftwood and debris collected thereon, * * * or for any cause other than the dam of defendants," plaintiffs could not recover, and it is alleged that the action of the court in this behalf constitutes reversible error. It will be observed that the requested instruction includes "the sandbars" in the river above said dam. That is sufficient, without more, to justify the action of the court in refusing to give the instruction. The sandbars in the river above the dam were alleged to have been caused by the negligent operation or failure to operate, the dam on the part of defendants. It constituted one of the elements of plaintiffs' cause of action, and the evidence tended to support the allegation. The instruction requested contained a material erroneous proposition, and the refusal to give it was proper.—*Blackmore v. Neale,* 15 Col. App. 49.

Moreover, it appears that all that was applicable and proper in the instruction refused was fully embraced in, and covered by, instruction No. 6 of the court's charge. While the court therein did not specifically mention sandbars, brush, trees, driftwood, rubbish, etc., it told the jury that, if they found from the evidence "that said overflow upon plaintiffs' land, if any, was caused * * * by obstructions

in the river other than said dam, or by any cause
other than said dam, then plaintiffs cannot recover.''
With this language in the charge, defendants are not
in a position to complain. A party cannot complain
of an instruction as favorable to him as the law and
the facts warrant or justify.

The contention of defendants was, that they had,
and maintained a permanent dam, and had so main-
tained it for thirty-five years, while the contention of
plaintiffs was, that the original dam constructed and
maintained by defendants and their predecessors was
of such material that it would readily wash out and
not overflow the river; that the dam of 1883 built in
its stead was supplied with flash-boards that were
operated in such manner as to prevent the overflow
of the river and consequent injury to adjoining lands,
and that the dam constructed in 1903 was likewise
built with flash-boards, but that defendants carelessly
and negligently failed to properly handle or regulate
the dam. Each side supported their respective con-
tentions with evidence. The charge given by the
court, fully and fairly presented to the jury, for their
determination, all the material issues in the case.
The jury were evidently more impressed with the
evidence upon the part of plaintiffs, and found ac-
cordingly. We cannot interfere with their verdict,
there being ample evidence to sustain it.

It is urged that the refusal of the court to permit
the jury to visit and view the premises was preju-
dicial to the rights of the defendants. Sec. 188,
Mills' Ann. Code, places the matter complained of
entirely within the discretion of the court, and settles
the matter against the contention of defendants.—
Saint v. Guerrerio, 17 Colo. 448.

The motion for a new trial set forth, as one of
the grounds thereof, ''that the verdict was a chance
or quotient verdict.'' Affidavits of two of the jurors

were filed in alleged support thereof, and that of the other four jurors in opposition thereto. Upon the matter as thus presented, the court refused to disturb the verdict. Sec. 217 of Mills' Ann. Code distinctly provides that such misconduct as alleged, may be proven by the affidavits of the jurors. In *Pawnee Ditch, etc., Co. v. Adams,* 1 Col. App. 250, 252, speaking upon this subject, it is said: "The difficulties which juries experience in arriving at a conclusion in cases where the damages to be assessed are unliquidated, and to be measured by what may be gathered from the varying opinion of witnesses, have led the courts to permit these verdicts to stand whenever the proof has satisfied them that the finding has subsequently been voted on and accepted by the jury as the legitimate expression of their deliberations. In most cases very little proof in this direction has been required." Assuming, but not deciding, that the verdict in question would come within the legal definition of "chance or quotient verdict," we think the proof was sufficient to satisfy the mind that the finding was "voted on and accepted by the jury as the legitimate expression of their deliberations," and comes clearly within the rule announced.

But if the converse of this were true, defendants are in no position to urge the matter here. Neither the motion nor the affidavits filed therewith, in support thereof, or in opposition thereto, were embodied in the bill of exceptions, and, therefore, are not properly a part of the record. While sec. 60, Mills' Ann. Code, makes certain motions, and rulings or decisions thereon, part of the record, without making the same such by a bill of exceptions, it does not extend the rule to the matters here involved, and we are precluded from considering them.—*Rutter et al. v. Shumway,* 16 Colo. 95; *Servant v. McCampbell,* 46 Colo. 292, 299; *Jordan v. People,* 19 Colo. 417, 423.

Several other contentions are presented by defendants for reversal of the judgment; some to instructions given, others to those requested, and refused, and some to the rejection and reception of evidence. The question of the sufficiency and fairness of the instructions given has heretofore been disposed of, and we do not consider it necessary to notice, in detail, the errors assigned upon the admission or rejection of evidence. We think the action of the trial court in these particulars in no wise prejudiced the rights of defendants. Upon a careful examination of the record, we are unable to find sufficient error to require a reversal of the judgment entered, and it is, therefore, affirmed.     *Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY concur.