No. 12,632.

LOCKE *v.* VAN WYKE.

(11 P. [2d] 563)

Decided May 2, 1932.   Rehearing denied May 23, 1932.

Messrs. GILLETTE & CLARK, Messrs. MOFFETT & HITCHCOCK, for plaintiff in error.

Mr. EDWIN P. HUDSON, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

THIS writ is prosecuted to review a judgment obtained in the Denver district court against plaintiff in error for damages claimed to have been sustained as the result of the alleged negligent diagnosis and treatment of a dislocated elbow.   As one of the grounds for reversal, plaintiff in error urges the insufficiency of the evidence.

The complaint charges that: "On June 4, 1928, defendant was a licensed and a practicing physician and surgeon on which date plaintiff fell and injured her right elbow and forearm, and employed defendant to diagnose, treat, and prescribe for said injury, but defendant negligently, unskillfully and carelessly diagnosed the injury as a bruised and crushed elbow, and informed plaintiff that the proper treatment of said injury was by bandaging said elbow and forearm, and applying salves and ointments thereon. Plaintiff relying thereon permitted treatment for a period of five months, which was by bandaging, salves, and ointment, after which plaintiff employed other physicians; and that the said diagnosis and treatment were incorrect; and that said injury was a dislocation of the elbow and a fracture of the head of the right radius bone; the treatment was not the usual treatment of physicians; that said dislocation of said elbow should have been reduced and corrected, and said fracture should have been treated and bandages and surgical devices applied. That by reason of the negligence of defendant, the fracture did not heal, and the elbow remained dislocated, and the hand useless, and plaintiff had to undergo a surgical operation for the setting of said bone and for the reduction of said dislocation." The defendant filed a general denial of these charges.

Plaintiff testified that on June 4, 1928, while a servant in the employ of Mrs. Anderson, she fell and injured her elbow; that defendant was called and immediately removed her to his office where: "The Doctor tried to set my arm, put me on the table, never gave me anything, just jerked the arm together some way, then he put on the elbow splint and wrapped it up. I saw the doctor the next day or that evening and he examined the arm through the fluoroscope, bandages and all. I continued to visit the doctor for five months every other day, he would feel of it and send me home. I can not get it to my face, I can move my elbow just a very little and can touch my body with my thumb only. At the end of the

five months I went to see Dr. Packard and Dr. Barnard. They had Dr. Stephenson take an X-ray. I am still going to Dr. Packard.'' She further testified that defendant said it was a crushed elbow and that the splint and bandages were kept on .the arm about five weeks. After that the treatment was, trying to move it a little bit. Defendant's husband and sisters testified somewhat similarly.

Dr. Robert Packard, an orthopedic surgeon, stated that plaintiff came to him on October 5, 1928, for an examination which showed ''an old dislocation of the right elbow, with fracture, complicated fracture * * * with a considerable amount of bony deposit or bone proliferation about the bones where the ligaments have been torn from them.'' He performed an operation which was ''not entirely successful because of the tremendous amount of bone deposit, but we tried to improve the position, which I feel that we did to some degree.'' Asked concerning the treatment of a dislocation of this character, he testified: ''* * * the usual practice is to take X-ray pictures of it; and unless there is some reason for not doing it, we advise the attempted reduction of the dislocation [resetting the bones], as soon as we can do it; that is the usual procedure; unless there is some unusual complication, such as shock or hemorrhage that would prevent it.''

Dr. Barnard, associated with Dr. Packard, testified: ''We made a diagnosis of dislocation of the right elbow with fracture—fracture sprain of the elbow joint.

''I think the two methods, two important things, clinically [of diagnosing an injured elbow], are looking at it, feeling it, seeing the motion; that is the first thing we do. The second is by taking an X-ray picture.

''It should be reduced as soon as possible after the dislocation, provided there are no other more important things to be concerned with, such as hemorrhage, extreme shock, or complicating fractures, fracture of the skull,

something like that, which will not permit of reducing it, * * * "

Upon cross-examination, he further stated:

"If you have a dislocation which is reduced, then re-dislocation after considerable time, we will say two or three weeks afterwards, say three weeks, it makes it a little harder, and is more difficult.

"We use the fluoroscope because I think you can see a little bit better, but X-rays are just as satisfactory. The fluoroscope makes no permanent record."

Plaintiff having rested, a motion for nonsuit was interposed and overruled.

Dr. McGraw, a witness for defendant, testified: "Where you find an injury about the elbow joint, the common practice is, first, to make a diagnosis; second, reduction and replacement; third, X-ray examination, and immobilize it with a splint until union takes place; fourth, the use of passive motion to work up the joint and overcome ankylosis or stiffness. Any angular splint that will produce immobilization; so that it won't jump out would be right. The arm should be bandaged and placed in a sling. The splint should be removed say from three to four weeks."

Mrs. Anderson, plaintiff's employer, stated that the doctor put her in front of the fluoroscope, then pulled on her arm to set it, manipulating it with his hands. "I heard a pop or snap." He then put on a splint which her brother had got and bandaged it with cotton and adhesive tape. After the splints and bandages had been removed, Mrs. Van Wyke told her that "she was in her clothes closet and bumped her arm, but I don't know what on, she said she bumped it and it hurt worse than when she fell in the basement—than when she broke it."

Defendant testified: "I diagnosed her arm as a fracture and dislocation. * * * Made a fluoroscope diagnosis as well as diagnosing by palpation, which is by feeling with the fingers. After the fluoroscope, I placed her on the operating table, I reduced the dislocation by this

method." After using the fluoroscope, he reduced the dislocation and applied the splints and bandages. "I saw her at various times every day or two until after the third week, when I removed the dressings and gave the arm passive motion to prevent stiffness. When I took the splint off, I found it in good condition, the fracture apparently having united on the radial side, and the dislocation having been reduced and no trouble. I told Mrs. Van Wyke that why I was taking the dressings off was to prevent having a stiff elbow so that I might get passive motion. I asked her to come back to my office the next day, but I did not see her for three or four days afterwards; and when she did come to me she had an arm as big as your head. There was no swelling present when I removed the splint, but it was greatly swollen when she later returned to me, and I could not do a thing with it. I put it on the fluoroscope and I found that I had a partial dislocation of the ulna, though the fracture in the radius had apparently healed. I could not straighten that at the time, and I asked her to come back. I tried at different times to reduce this swelling with application of hot fomentation and also by liniments."

Upon inquiring as to what caused this condition, plaintiff stated:

"She said to me that she fell in this closet and it hurt her worse than it did when she first broke it.

"I put her under the fluoroscope to diagnose it because I could not palpate it, the swelling was so great. When you have internal swelling in the muscles and tendons, and in the joints which hold the elbow in place—if these are swollen and tense, it is impossible to do anything with even a fracture, or any dislocation. I tried at different times, but the swelling never went down. She admitted to me that she was using the arm, which she should not have done, and which I cautioned her not to do the first time, before she had injured it over again."

Mary Kossler, an electro-therapeutic technician, in the employment of defendant, stated: "The fluoroscope

is a machine similar to the X-ray, but it makes no plates or pictures. With it, it is possible to see the movement of bones and of different organs, even the motion of the heart. Instead of the still picture you get the motion with the fluoroscope and you can manipulate your bone or the part and see it.'' She substantiated defendant's testimony as to the original diagnosis and treatment. ''We next saw Mrs. Van Wyke about three or four days afterward. Her arm was very much swollen and painful, another fluoroscope showed a dislocation of the ulna backward, which was different from that three or four days previous when the splints were removed as there was no dislocation at that time. Mrs. Van Wyke said that she had slipped in the closet and bumped her elbow, which was very, very painful. The doctor told her to bathe the arm in hot water and gave her liniment to rub in until the swelling should be reduced. She returned several times afterward, for how long I do not remember. He manipulated the arm, tried of course, to keep it limbered up, and to get the swelling down.''

The testimony of Anna Kossler, also employed by defendant, coincided with that of her sister. She stated, ''I am positive that the dislocation was reduced in the beginning.'' ''The conversation was that she had redislocated it.''

Dr. Dean stated: ''In my judgment the proper treatment, after a satisfactory diagnosis, would be to reduce the dislocation by manipulation and set the fracture. The reduction of the dislocation would be accompanied by a sound, for instance if you have a dislocated shoulder, when it is replaced in the socket where it belongs, oftentimes you can hear it. * * * I think with a dislocated elbow, you are very likely to have some sound as it goes into the socket, as the ulna is a hinged joint and when put back it is liable to make a sound. I would bandage the arm, put it in a proper splint, and keep it still. Bandages should be removed in three or four weeks, depending on the condition presenting itself on examination. I

would remove the splints and examine the arm and use a little passive motion or gentle motion of the joint to obviate any stiffness if possible. I would advise keeping the limb quiet in a sling, with no attempt to use it. The operation of reducing the dislocation would appear to the ordinary layman as a kind of a jerk and pull on the arm. The use of passive motion might be attended with considerable pain because of stiffness of the ligaments and muscles.''

On rebuttal, plaintiff testified, ''I just brushed my elbow against the door. I never stopped work or anything, it never did hurt.''

Her husband stated that, ''she said she brushed it along the door.''

A motion for a directed verdict for the defendant was interposed and overruled.

■ We deemed it necessary to summarize the salient features of the evidence with greater particularity than is customarily used in order to show clearly that the evidence is totally inadequate to support the verdict and judgment. It was not shown either by expert or lay witnesses that defendant failed to do that which he should have done or did that which he should not have done. The testimony developed by defendant clarifies the facts showing that after the splints had been removed, plaintiff's condition was aggravated by her own negligence, the effect of which she seeks to minimize.

■■ Defendant, speaking in common parlance, may have told plaintiff that she had a ''crushed elbow'' but all of the testimony unquestionably shows that he properly diagnosed her injury as a dislocated elbow and immediately applied the standard of treatment therefor used by reputable physicians. It is elementary that, in the absence of a contract to the contrary, a physician does not guaranty a cure. A bad result in itself is no evidence of negligence. *McGraw v. Kerr*, 23 Colo. App. 163, 128 Pac. 870.

We sympathize with plaintiff's condition but defend-

ant cannot be mulcted in damages therefor under evidence which is wholly insufficient to support the charges of negligence.

The court erred in refusing to direct a verdict for the defendent.

Counsel for defendant in error urge that negligence in the diagnosis of an injury and the adoption of a standard of treatment can be shown only by expert witnesses and that this case is controlled by *McGraw v. Kerr, supra*, and not *Daly v. Lininger*, 87 Colo. 401, 288 Pac. 633. A consideration of this question is unnecessary because here there appears neither lay nor expert testimony showing negligence.

In view of the foregoing, it becomes unnecessary to consider other assignments of error.

Accordingly the judgment is reversed and the cause remanded with directions to enter judgment for defendant for his costs.