## No. 15,167.

### EDWARDS *v.* QUACKENBUSH
(149 P. [2d] 809)

Decided May 1, 1944. Rehearing denied June 12, 1944.

Mr. HENRY H. CLARK, Mr. CLARENCE L. IRELAND, for plaintiff in error.

Messrs. VAN CISE, ROBINSON & CHARLTON, for defendant in error.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THE defendant in error, a young housewife, to whom we shall hereinafter refer as plaintiff, brought the action, here for review, against plaintiff in error, a physician and surgeon, hereinafter to be called defendant, and his then codefendant Dr. L. James Dixon, to recover damages in the sum of $25,000 allegedly resulting from the negligent severance of plaintiff's ileum (the lower portion of the small intestine) from the caecum (the cul-de-sac in which the large intestine begins) in the performance of an appendix operation, and negligently binding together of small loops of the small intestine, resulting in an almost complete obstruction therein. By an amendment to the complaint, plaintiff further alleged negligence of the defendant in his postoperative treatment. By his answer, defendant denied the allegations of the complaint as to negligence and damage; asserted that he had saved plaintiff's life and that in the performance of the appendectomy defendant had rendered his best services and exercised his best judgment, and counterclaimed for $110 allegedly owing from plaintiff for his services in that connection. Dr. Dixon, in his answer, stated that he had not participated in the operation beyond handing the surgical instruments used therein to defendant; that upon the basis of his observation, plaintiff's intestine was not severed and, upon information and belief, denied the remaining allegations of the complaint.

Trial was to a jury. Defendants unsuccessfully inter-

posed motions for nonsuit upon the completion of plaintiff's case, and at the close of all the evidence, they moved for a directed verdict, principally upon the grounds of the insufficiency of the evidence to establish negligence or damage. The court sustained this motion as to Dr. Dixon but overruled it as to the defendant. However, in such connection and at that time, very properly as we view from our examination of the evidence, the court took from the jury the further consideration of the charges of postoperative negligence and malpractice against defendant, as well as the claim of plaintiff that her ileum might have been severed by a ligature wrongfully placed therearound in the performance of the appendectomy. This circumscription on the scope of the inquiry, although patently favorable to defendant as to the aspects withdrawn, was not objected to by plaintiff then or now. Thereupon, on this single issue, under instructions not objected to by defendant, the case was submitted to the jury which found in favor of plaintiff and assessed $18,000 damages against defendant. Subsequently defendant's motion for new trial was overruled and judgment entered in accord with the verdict. Asserting, inter alia, that the evidence was insufficient to establish the negligence of defendant, or to warrant the submission of the question to the jury, defendant specifies that the court erred in overruling his motions for nonsuit and for a directed verdict in his favor, and in not granting a new trial.

Briefly summarized, the evidence on the issue of liability as limited by the trial court is as follows: Plaintiff was stricken with acute appendicitis and her affliction was correctly diagnosed as such by defendant, who properly recommended an early operation. In pursuance, plaintiff was taken to St. Philips Hospital, in Denver, which was conducted by Dr. Dixon. There her appendix was removed by defendant. In a few days fecal matter (excretions of the bowels) began to exude from the incision. This and other disturbing conditions

continuing, as hereinafter will be mentioned in greater detail in our discussion of the question of damages, several months thereafter an operation by another surgeon disclosed, as he testified, that plaintiff's ileum had been cut in two and that the two ends were about eight inches apart. Fortuitously, by skillful and delicate successive operations by the latter surgeon, a proper union of the loose ends of the ileum was finally effected. The surgeon who performed the second and subsequent operations, when asked to account for the separation of the ileum, said: "It could have been an accidental severance with a knife or scissors. That's the only way." The resident physician at Denver General Hospital, who assisted in the second operation, testified: "The terminal ileum was found to be completely severed from the caecum. * * * It was severed or cut so the two ends were not approximating one another; they were several inches away. * * * The stump (of the lower portion of the separated ileum) looked like it might have been severed. I couldn't say definitely, — with some sharp instrument of some sort." As defendant stresses, on cross-examination this witness admitted that he could not pronounce with certainty that the severance of the ileum had been accomplished by a mechanical instrument. Defendant testified that he did not either cut or sever the ileum in the course of the appendectomy and claimed that his placing a gauze packing around the ileum before the appendix was cut precluded such a possibility. Dr. Dixon substantiated both of these statements. However, cross-examination and the testimony of other medical witnesses tended to show that in the procedure actually followed in the questioned operation positive infallibility in the protection of the ileum from an accidental cut was not insured by the insertion of gauze packing. Defendant and Dr. Dixon further stated that plaintiff's intestines were friable from inflammation caused by some pre-existing infection, and intimated that the fecal discharges through the incision came via

a fistula from lesions resulting therefrom. In opposition, the surgeon and assistant performing the corrective operations, said plaintiff's intestines were normal and displayed no signs of any diseased condition whatsoever. Defendants called five other physicians and surgeons, who as experts testified hypothetically that had the ileum been severed completely the early death of the plaintiff from peritonitis caused by the consequent flooding of the abdominal cavity with fecal matter, would have been almost inevitable, and since she had not perished, expressed as their opinion, that the intestine had not been severed in the appendectomy. Plaintiff met this theory with expert medical testimony to the effect, as it was said the second operation actually revealed, that through nature's protective processes, the upper end of the severed bowel, following the line of least resistance, had become adherent to the abdominal wall at the place of the incision and there had formed a seal whereby the fecal matter from the organs above was discharged on the outside of the abdomen at that point, and that coincidentally the lower severed end of the intestine, being deprived of fluid, had sealed off and taken a position of repose. Also, there was disagreement in the opinions of the medical witnesses as to the length of the period during which rectal discharges might continue after a severance of the ileum, the evidence of those for plaintiff, on the one hand, being that such as factually were known to have occurred, properly could be attributed to previous accumulations in the lower bowels below the disjunction, while contra, defendants' experts expressed that the established rectal emissions demonstrated that there had been no severance of the bowel tract.

▮▮ It is to be observed that the testimony of no medical witness so much as suggests that the ileum at the alleged area of disjunction was involved in the original condition of acute appendicitis or that it was necessary to cut it, treat it or do anything at all with it, in

order to remove the appendix. Consistently, the defendant, as a witness, never claimed that any orthodox operational procedure or method of treatment justified the questioned severance of the ileum in an appendectomy, but sought vindication from liability upon a denial that he had in fact severed the intestine. While, as appears from the foregoing resumé, the testimony was in sharp conflict as to both factual and hypothetical matters, it seems to us, as was the view of the trial court, that the evidence upholding the contention of the plaintiff was amply sufficient to warrant a submission of the case to the jury, and to support the finding of liability returned by it. The resolution of questions relating to the credibility and reliability of the various witnesses and the weight to be given their testimony, the subject of many pages of the briefs of counsel for defendant, was for the jury and its conclusions in this field may not be disturbed by us. In support of their arguments on this point counsel for defendant cite and claim the benefit of a great number of authorities relating to the safeguards from liability accorded by the courts to physicians and surgeons in their practice, where the conduct in question was shown to have been in pursuance of a recognized technique, in accordance with established standards of treatment, where the unfavorable results were brought about by honest errors or mistakes in judgment in diagnosis or procedure. Typical of such cases from this jurisdiction are: *Gleason v. McKeehan,* 100 Colo. 194, 66 P. (2d) 808; *Brown v. Hughes,* 94 Colo. 295, 30 P. (2d) 259; *Locke v. Van Wyke,* 91 Colo. 14, 11 P. (2d) 563, and *McGraw v. Kerr,* 23 Colo. App. 163, 128 Pac. 870. It seems to us, that in so contending counsel have lost sight of the circumstance that the transgression here charged, as the jury was instructed without objection, was not directed to any dereliction in the performance of the appendectomy as such, but to the needless and negligent injury to an unrelated organ which all of the medical witnesses agreed, should

not have been cut in any degree in an appendix operation. In other words, adopting the analogies and the conclusion expressed in the opinion in *Vergeldt v. Hartzell,* 1 F. (2d) 633, 636, a case cited by us with approval in *Daly v. Lininger,* 87 Colo. 401, 288 Pac. 633, the severance of plaintiff's ileum, at the point herein claimed, in the performance of an appendectomy would be as, "If a surgeon, undertaking to remove a tumor from a person's scalp, lets his knife slip and cuts off his patient's ear, or if he undertakes to stitch a wound on the patient's cheek, and by an awkward move thrusts his needle into the patient's eye, or if a dentist, in his haste, leaves a decayed tooth in the jaw of his patient and removes one which is perfectly sound and serviceable, the charitable presumptions, which ordinarily protect the practitioner against legal blame where his treatment is unsuccessful, are not here available."

█ While, in the observance of our rules and decisions with respect to appellate procedure, hereinafter to be cited, we are not called upon to consider defendant's specifications based upon the refusal of the court to give his requested instructions, we, nevertheless, mention at this point, to avoid repetition of the matters just discussed, that such considerations properly warranted the trial court's refusal to give defendant's Instruction No. 7 which related irrelevantly to the liability of a physician or surgeon for mistakes of judgment, the abandonment of standard procedures and the adoption of experimental methods. Because a portion of tendered Instruction No. 9 was included in given Instruction No. 12, and on account of possible ambiguities and legal anachronisms in the remaining paragraph, the court did not err in its refusal. Tendered Instruction No. 8 was properly refused because of the assumption therein, as if admitted, of certain facts in sharp controversy, which at least would have tended to mislead the jury as to the real issue on liability submitted.

It next is asserted by defendant that the verdict re-

turned was the result of a quotient process, and so should have been set aside. Following the returning of the verdict, at the request of counsel for defendant, a Mr. Nelson, claim superintendent for the surety company carrying defendant's liability insurance, interviewed nine of the jurors, being accompanied by a Mr. Abbott, a shorthand reporter when five of such jurors were interviewed, and by a Mr. Dennis, another shorthand reporter, when another was questioned. These individuals, and a Mr. Burns, who talked with one unnamed juror, made affidavits concerning the alleged statements of the jurors interviewed concerning the deliberative procedure of the jury.

■■ In addition to the foregoing mentioned affidavits, defendant filed one of the juror Dinsmore pertaining to the same matters, in support of the motion for new trial. On the new-trial hearing, on motion of plaintiff, the court struck from the record all of the aforementioned affidavits, except that of juror Dinsmore, on the ground that they were "statements of third persons; statements made to affiants by jurors not under oath," which were inadmissible in determining the merits of the motion for new trial and sought impeachment of the verdict in a manner not authorized by law. While defendant specified error (point number 7) for the court's striking these affidavits, counsel fail to argue the question in their briefs or point to a single decision challenging the propriety of the court's ruling on the motion to strike. Clearly, under our practice, failure to argue this point constituted an abandonment thereof. See, *Zall Jewelry Co. v. Stoddard,* 68 Colo. 395, 190 Pac. 506. Notwithstanding, counsel for defendant primarily base their argument that the verdict was a quotient one on these *stricken* affidavits, which they have failed to show were legally proper of consideration. Unquestionably, a quotient verdict, as such, is invalid in Colorado; but our appellate courts consistently have held that where there is no antecedent agreement by the jury to

be bound by the resulting quotient, or, independently, it adopts an amount equal to the quotient after it is ascertained, the verdict is good. *Denver v. Talarico,* 99 Colo. 178, 61 P. (2d) 1; *Greeley Irr. Co. v. Von Trotha,* 48 Colo. 12, 108 Pac. 985; *Empson Packing Co. v. Vaughn,* 27 Colo. 66, 59 Pac. 749; *Colorado Springs v. Duff,* 15 Colo. App. 437, 62 Pac. 959; *Pawnee Ditch Co. v. Adams,* 1 Colo. App. 250, 28 Pac. 662. Whether or not a verdict is a quotient verdict is a question of fact for the trial court. *Denver v. Talarico, supra.* Stripped of the support of the rejected affidavits, and probably even with them, under the facts developed at the hearing, wherein the affidavits of all twelve jurors were considered, there can be little doubt as to the validity of the verdict upon this score under the holdings of the authorities last cited, or of the propriety of the trial court's action in upholding it.

 It is further contended by defendant that the verdict should have been set aside by the trial court upon the ground that the damages of $18,000 awarded plaintiff were excessive and were given under the influence of passion or prejudice. This question presents the most serious problem in the review, a circumstance which has induced the incorporation in this opinion of the quite detailed statement of the evidence of damages soon to appear.

Commenting on the functions of a court in considering applications for a new trial on the ground that the amount of damages fixed by a verdict was excessive, we had the following to say in the case of *Colorado Springs v. Kelley,* 65 Colo. 246, 250 (176 Pac. 307):

"As relates to the contention of excessive damage, we must bear in mind and be governed by the rule laid down by Chancellor Kent more than a century since, and generally adhered to by all courts, and by this court; that it is exclusively the province of the jury to estimate and assess the damages, and that the amount to be al-

lowed in such cases, rests largely in their sound discretion. He said:

" 'The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike everyone with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, we cannot, consistently with the precedents, interfere with the verdict. It is not enough to say, that in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries.'

" 'And as was well said by Justice Story in *Thurston v. Martin*, 5 Mason 497, Fed. Cas. No. 14018:

" 'It is one thing for a court to administer its own measure of damages in a case properly before it, and quite another thing to set aside the verdict of a jury because it exceeds that measure.'

"No case has been cited from this court and we know of none, wherein there has been a departure from the rule stated."

A portion of the above language was requoted, and the rule approved in the recent case of *Riss v. Anderson,* 108 Colo. 78, 114 P. (2d) 278. Also consistent are the texts of 39 American Jurisprudence, page 150, section 144, and 46 Corpus Juris, page 197, et seq., section 48.

■ Concerning the measure of damages, the court in the present case by Instruction No. 11, without objection from defendant, informed the jury: "If your verdict is for the plaintiff it will then become your duty to assess the damages which she has sustained, and in determining the same you will fix such amount, not exceeding $25,000.00, as will reasonably compensate her for the damages which she has established were the direct and proximate result of the negligence complained

of. And in this connection you have a right to consider her pain and suffering, both physical and mental, the time she spent in various hospitals, the operations which she underwent in the Denver General Hospital, and any other evidence affecting her health and physical condition." As relating to these elements of damage, the evidence, supplementing that above stated, disclosed as follows: June 19, 1940, plaintiff entered St. Philips Hospital for an appendectomy. Defendant had estimated that she would be able to return to her home in ten days and so informed her. Due to defendant's negligence in severing the ileum, as the jury found, plaintiff was not discharged from St. Philips until September 2, and then, not because she no longer needed hospital treatment, but, in the words of defendant, because she "had no money to pay for services in the hospital." During this seventy-five day period, fecal matter continuously was emitted from the incision; plaintiff always was in pain and was sick and weary and wept at frequent intervals. Discharged from St. Philips she spent one night in her home where she found she was unable to care for herself, whereupon, in a samaritan spirit, a friend took her into her home. Plaintiff's condition became worse and on two nights she was critically ill. In desperation, plaintiff's husband, as well as her friend, telephoned defendant, who informed them he could do nothing more because of the state of plaintiff's finances and advised: "No doubt in my mind she needs another operation— take her to the Denver General." It is quite clear that beyond making the suggestion, defendant gave no assistance whatsoever in procuring her admission to the latter institution, but finally, on September 17, as a result of the appeals through other agencies, the plaintiff, in critical condition, was taken to Denver General Hospital as a charity case. She was carried in upon a stretcher and, as described by a resident physician there, then was suffering, in poor physical condition, pale, pulse weak, low blood count and generally depressed physically and

mentally. In ten days she was operated (double-barreled ileostomy), to overlap the severed ileum, the initial corrective step, and remained in the hospital until January 2, 1941, a period of 108 days. Following this operation she ran a high temperature for a considerable time and was given blood transfusions and continuous intravenous solutions of glucose and salt to alleviate the excessive distention in her abdominal region. She left the hospital in a wheel chair and returned in about a month (January 28) for a second major operation designed to further correct the havoc caused by the severance of her intestine. On the occasion of this third operation (the second at Denver General), the abdominal wall was opened and a clamp applied to the intestines. As the result, abdominal pain developed and plaintiff had a severe febrile reaction and was delirious. On February 26, she was discharged from the hospital for convalescence to build up for the next operation. However, because of infection which was accompanied by pains and chill, she was again confined to the hospital from March 12 to 26, when she was released to await the final operation and was advised to stay mostly in bed, which she did. She entered the hospital for the last operation on July 7, but such could not be performed until the 29th because the skin around the incision was excoriated. During this period she developed a high fever which necessitated her being placed under an oxygen tent. In this operation her intestines finally were reunited and the ileum, which since September 27, 1940, had been fastened to the outside of the abdomen, was placed in its proper position. She was discharged August 5, but drainage from the peritoneal cavity still persisted, partially to correct which she was returned to the hospital October 24, where she remained until the 28th.

It thus appears that the total period of plaintiff's hospitalization was 272 days, during which she underwent three major operations, in addition to the first performed

by defendant. Her suffering was almost continuous and her mental and physical distress acute. Several times her condition was critical and twice extreme unction was given.

At the time of the trial in November, 1941, plaintiff still had drainage from the incision, with no time fixed as to when it would heal, if ever. On a space of eight inches in diameter her abdominal skin and outer muscles were shown to have been replaced by scar tissue alone. Thus her admission at the trial, that she "felt swell," stressed by counsel for defendant, must be considered as a relative expression of relief from her former predicament and not a confession of unimpaired recovery.

Considering this factual background, can it be said that the damages of $18,000 awarded by the jury, were "so outrageous as to strike everyone with the enormity and injustice of them?" *Colorado Springs v. Kelley, supra.*

■ The trial judge did not think so. Considering the question in strict conformity with the criteria of the authority last cited, as were shown by his remarks, he refused to set aside the verdict. As a matter of law this action of the trial court is of distinct importance upon review, since "The question whether a verdict is excessive is also one peculiarly within the province of the trial judge; it is one that he is better qualified to determine than an appellate court." 3 Am. Jur., p. 453, §893. "No mere difference of opinion, however decided, justifies an interference by the appellate court with a verdict on the grounds of excessive damages." Id. p. 452. In the light of these principles, and from our consideration of the evidence of damage, we are unwilling to say that the trial court abused its discretion in permitting the verdict to stand.

■ In the course of the voir dire examination in the selection of the jury, Mr. Van Cise, of counsel for plaintiff, asked: "Have any of you gentlemen ever been an officer or employee of a company that insures against

malpractice?" Promptly a motion for mistrial was interposed by counsel for defendant. The arguments on the question were had in chambers, following which the court overruled the motion and held the question proper. Error is specified to this ruling. As counsel for defendant concedes, ordinarily it is not reversible error in this jurisdiction in cases of this character to ask jurors whether they are interested in a certain designated insurance company as officers, employees, stockholders or otherwise. See, inter alia, *Johns v. Shinal*, 103 Colo. 381, 86 P. (2d) 605; *Rains v. Rains*, 97 Colo. 19, 46 P. (2d) 740, and *Independence Co. v. Kalkman*, 61 Colo. 98, 156 Pac. 135. The rationale of this rule is: "That a plaintiff is entitled to inquire if any member of the panel has an interest in the corporation which has, or is supposed to have, indemnified the defendant against the liability asserted." However, it is argued the right to so inquire does not permit asking a blanket question concerning *all* insurance companies but must be limited to a certain company to be expressly named. Whatever may be the proper procedure hypothetically, we are satisfied that in the instant case the court committed no error in the ruling made because of the circumstances developed in the hearing in chambers, which were that privately and informally, previous to propounding the question in consideration, Mr. Van Cise, who said he was without information on the subject, had asked Mr. Clark, who appeared for defendant, what indemnity company was interested in the outcome of the case, without securing a disclosure of a name. In chambers, in the presence of the judge, Mr. Van Cise again asked Mr. Clark and another counsel, who represented Dr. Dixon, for the name of the company or companies by which they were employed or which might be affected by the action, and again was denied any information, whereat, upon the express basis of "Certainly if he (Van Cise) does not know the name of the company and cannot find it out, he is entitled to ask the general question," the court al-

lowed the question to stand. Following the ruling Mr. Clark divulged the name of the insurance company involved and presumably thereafter inquiries to the jurors concerning their interests or employment referred to the proper company by name.

 Conceiving that the abstract filed by defendant did not properly reveal the record, counsel for plaintiff has filed a supplemental abstract and has asked that the cost thereof be taxed to defendant under R.C.P. Colo., Rule 115 (a). It is quite true that the defendant's abstract does not at all abstract the given instructions or any of his tendered instructions, to the refusal of which error was specified, nor is there set out therein in any manner, except by way of reference one of the affidavits for new trial which is quoted from or commented on at length in defendant's brief. As a matter of fact, due to the turmoil over the abstracts, counsel discovered that the affidavit mentioned was not really included in the record and that therein and in the specifications the instructions in question were not properly numbered. These matters now have been supplied by a supplemental record. In decisions rendered before the adoption of the present Rules of Civil Procedure, we held that assignments of error based upon documents or instructions not appearing in the abstract will not be considered. *Knowlton v. Knight-Campbell Co.*, 59 Colo. 51, 147 Pac. 330, and *Zall Jewelry Co. v. Stoddard, supra.* Counsel for defendant argues that the requirements fixed by these decisions have been abrogated by Rule 115 (a), supra. Because of this belief we have herein considered the omitted matter in making disposition, but desire to express that because of the similarity of former Supreme Court Rule 36 and new Rule 115, we perceive no occasion for any modification of our pronouncements in the cases last cited. Thus, as to these features the penalty of omission ordinarily lies in the results of a nonconsideration of points of error specified and not in a taxing of costs.

As further justification for the filing of their supplemental abstract, counsel for plaintiff claim that defendant's abstract is deficient in omitting certain testimony and in importing the wrong construction to some included matter in its transposition to narrative form. Probably the omissions may be accounted for by the elimination of evidence relating to the case of Dr. Dixon, concerning the necessity of the inclusion of which there well could be a legitimate difference in opinion. As we apprehend, the dispute as to the remainder largely arises from the zealous insistence of both counsel that the abstract recitals should be in the form most favorable to their respective contentions and in a considerable degree the two abstracts do conflict in the manner of recital and matters stressed, a circumstance which has required direct recourse to the record in our study of the case. In view of these considerations, and the further conviction that the same disposition would have been reached in the case without the filing of the supplemental abstract, we decline to tax the cost thereof to defendant.

Finding no error, the judgment is affirmed.

MR. JUSTICE BAKKE and MR. JUSTICE BURKE dissent in part.

MR. JUSTICE GOUDY dissents.

MR. JUSTICE BAKKE, dissenting in part.

I dissent to that portion of the Court's opinion which approves the award of $18,000. I think the amount is clearly excessive. The suggested inference in the opinion of a permanent injury as derived from the language, "with no time fixed as to when it would heal, if ever" relating to the small aperture in plaintiff's abdomen, present at the time of the trial, is not based upon any testimony in the record. I think her speedy and apparent complete recovery after the corrective operation, as indicated by her statement that she "felt swell," is a complete refutation of the suggestion made in the

opinion. Without this suggested possibility of a permanent injury the judgment is clearly excessive.

That permanent injury is an essential element appears from our opinion in *Kohut v. Boguslavsky,* 78 Colo. 95, 239 Pac. 876, a case in which a young married woman was given a verdict for $15,000. We reversed the judgment as excessive, saying: "We do not think the evidence discloses any permanent injuries were sustained by the plaintiff." This same test was applied in the Colorado Springs case cited in the Court's opinion.

The author of the court opinion cites, and quotes from, American Jurisprudence. The same work under the heading "Appeal and Error," in addition to the matter quoted, contains the statement: "However, when a verdict is so grossly disproportionate to any reasonable compensation warranted by the facts that it shocks the sense of justice and raises at once a strong presumption that it is based on prejudice or passion, rather than on sober judgment, the appellate court should not hesitate to set it aside * * *." 3 Am. Jur. 454.

What is reasonable compensation in a case of this character? A study of the many cases digested in Parmele's Damage Verdicts under the caption, "Verdicts in Actions Against Physicians, Surgeons or Dentists, for Malpractice, Attacked as Excessive," convinces me that that verdict is excessive when compared with what is considered proper in this type of cases. The largest sum held not excessive in the long list of verdicts given, is for $10,000: "Operation to remove ovary, appendix and hemorrhoids; gauze left in vagina, without patient's knowledge even after being discharged from physician's care, Cowan v. Bouffleur (1915) 192 Ill. App. 21." The case is not fully reported in 192 Ill. App., but the allegation recited that "plaintiff's health was seriously injured thereby." Parmele's Damage Verdicts, Vol. 2, p. 1294. In the list of excessive verdicts the two largest sums are $12,620 and $12,000 respectively. (Vol. 2, pages 1294-1299, supra). It is true that this same authority

cites a long list of verdicts for larger sums, but in those cases the injuries were permanent resulting in disfigurement, amputation, etc.

The question of whether the jury's consideration of the instant case resulted in a quotient verdict, is a close one, but in view of the record, I agree that we would not be justified in reversing the judgment on the ground that it was based upon such a verdict; however, a review of the affidavits touching the subject impresses me with the view that the subject is a debatable one.

The fact that the jury returned its verdict for the large amount imposed as damages in about thirty minutes, in connection with the circumstances that the trial occupied the attention of the court for some two weeks, indicates to me that matters other than a careful, deliberate and unbiased consideration prompted the result.

It will be noted the court's opinion cites no specific malpractice case in which a judgment for $18,000 was approved, where no permanent disability was established. There may be such cases, but my own search of the authorities disclosed none, and none are cited in the briefs.

MR. JUSTICE BURKE dissenting.

I think this verdict excessive, and the record convinces me that it was so because of passion and prejudice. For that reason, I dissent.